## MOFFETT v. ARABIAN AMERICAN OIL CO., Inc.

United States District Court
S. D. New York.
April 25, 1949.

See, also, D.C., 8 F.R.D. 566.

William Power Maloney, New York City (Max Dorff, Bernard Weiss, New York City, of counsel), for plaintiff.

Hughes, Hubbard & Ewing, New York City (Joseph M. Proskauer, Charles E. Hughes, Jr., Phillip W. Haberman, Jr.,

Rowland Stebbins, Jr., New York City, of counsel), for defendant.

CONGER, District Judge.

Defendant seeks to set aside the verdict of the jury rendered in favor of the plaintiff in the sum of $1,150,000.

Defendant makes two motions; (1) to set aside the verdict of the jury and, notwithstanding the verdict, to enter judgment in favor of the defendant, in accordance with the defendant's motion for a directed verdict on the trial and on the ground that the motion for a directed verdict should have been granted for all the reasons upon which the said motion was based when made and because:

a. The claim asserted by the plaintiff is against public policy;

b. The verdict is contrary to law;

c. There is no evidence to support the verdict;

d. There is no evidence to sustain the cause of action pleaded;

e. There is not sufficient evidence to support the verdict;

f. The verdict is contrary to the evidence;

g. That the ends of justice so require; (2) in the alternative defendant further moves to set aside the verdict and for a new trial on all the grounds heretofore set forth as a basis for a directed verdict and for judgment notwithstanding the verdict, and on the following additional grounds:

a. The verdict is contrary to the weight of the evidence;

b. The verdict is contrary to the weight of the credible and competent evidence;

c. The verdict is for excessive damages;

d. The Court erroneously received evidence over the objection of the defendant as to the results allegedly procured by the plaintiff in respect of the alleged advances by the Government of the United Kingdom of Great Britain to the Government of Saudi Arabia;

e. The Court erroneously received evidence over the objection of the defendant as to the alleged value of plaintiff's alleged services;

f. Errors in the reception and exclusion of evidence;

g. Errors in the charge and in the refusals to charge;

h. Prejudicial and inflammatory remarks and appeals to passion and prejudice by the plaintiff and his counsel.

Defendant also renews its motion to dismiss the complaint and for a directed verdict on all the grounds upon which they were based when heretofore made in the course of the trial, decisions upon which were reserved.

I shall first take up defendant's motion to set aside the verdict and for judgment for defendant.

The first and main questions here are whether there is any evidence to support the verdict (c), and to sustain the cause of action pleaded (d). It seems to me these should be passed on together.

In other words, did he accomplish that which he claims he did and that which he claims compensation for? I am assuming that plaintiff made out a case as to the making of the contract.

Plaintiff's claim in this regard is contained in paragraph Ninth of the complaint and is as follows:

"Ninth: Thereafter and pursuant to the terms of his retainer, during the period from April 1 to January 1, 1942, plaintiff performed certain work, labor and services on behalf of the defendant herein resulting in the government of the United States requiring the government of the United Kingdom of Great Britain, as a part of certain financial negotiations then in progress between the United States of America and the United Kingdom of Great Britain, to assume the budget requirements of the Kingdom of Saudi Arabia for the duration of the war, with a resultant saving to the defendant herein of at least Thirty Million ($30,000,000.00) Dollars and the salvation of its oil and mineral concessions, the value of which have been variously estimated from Two to Ten Billion Dollars."

In the summer of 1941, representatives of the British Government were in this country seeking from the American Gov-

ernment a collateral loan. Jesse Jones, then Federal Loan Administrator and Chairman of the Reconstruction Finance Corporation was representing the United States and had charge of the making of the loan. The loan was finally made and the transaction consummated on July 21, 1941 for $425,000,000.

It is clear from the complaint that plaintiff claims that as a result of his services the Government of the United States required the Government of the United Kingdom of Great Britain as a condition of this loan to assume the budget requirement of the Kingdom of Saudi Arabia for the duration of the War. There can be no question about this. The plaintiff's attorney in his summation stated:

"So that there may be no question about this our claim is that as a result of Mr. Moffett's services in Washington, the British were required to take out of that $450,000,000. loan whatever King Ibn Saud needed and pay it over. That is our claim and that is what we maintain was done. No two ways about it."

In my charge to the jury I tried to make it plain just what plaintiff was claiming he accomplished and just what he was claiming he should be compensated for. I did state to the jury as follows:

" * * * And as to the result which was obtained, he (plaintiff) has the burden of proving also that he was the procuring cause, the efficient cause, or the proximate cause of this result which he says was this:

"That as a result of his efforts the Government of the United States in allowing this loan on July 21, 1941, that as a condition of that loan it required the Government of the United Kingdom of Great Britain, as a part of this loan, to assume the budget requirements of the King of Saudi Arabia for the duration of the war."

Plaintiff claims that his proof shows that a chain of events was started in motion by the initial visit of the plaintiff to President Roosevelt, which chain of events ended with the result, which the Oil Company employed the plaintiff to achieve, being achieved; that the plaintiff had been to Washington; that he had started this chain of events in motion; that he had seen the President; that it was the President who initiated the suggestion of giving the aid via the British after a talk with Harry Hopkins; that it was carried thus to a logical conclusion.

This is a rather logical argument. Let us look at it and see on what it is based.

The defendant and its allied companies were in a rather serious situation with the King of Saudi Arabia. The King was in bad financial circumstances. He needed money to finance the budget requirements of his Kingdom. Prior to April, 1941 defendant had loaned to the Kingdom of Saudi Arabia the sum of $10,000,000. In the early part of 1941 the King was demanding that the oil interests represented by defendant give him $6,000,000, either as a loan or as advance royalties. For many reasons the oil interests were loath to do this and plaintiff claims that representatives of defendant came to him and asked him to see if there was any way possible under Lend-Lease or otherwise to get the government to take over the advancement of this six million dollars a year on the same basis they had been doing on future royalty payments."

Plaintiff testified he did see the President on April 9, 1941 and talked with the President about getting some sort of financial assistance for Saudi Arabia. Nothing concrete came out of this interview except that the President suggested something might be worked out along the lines of a sale of a finished product. In accordance with the President's request a letter and memorandum were sent to the President on or about April 16, 1941. No reply to this letter was received and plaintiff testified he went to Washington and saw the President on or about May 16 and that at that time the President told him that he (the President) had read the letter and memorandum and that the President then asked plaintiff to take up the matter with Secretary of the Navy Knox and that the President said to him, "If something could not be worked out try some other route and to come back and see me in due course."

Plaintiff testified that on a number of occasions during April and May, 1941 he conferred with President Roosevelt and other officials in Washington seeking means to render financial aid to Saudi Arabia.

Plaintiff further testified that on June 9 he met Harry Hopkins who told him among other things that he (Hopkins) had discussed the matter with the President and the President had advised him to tell Jesse Jones to stipulate in making any loans to the British, collateral or otherwise, that it was up to them to take care of the financial requirements of King Ibn Saud and that Harry Hopkins then advised plaintiff to follow up the matter with Mr. Jones.

Plaintiff testified that on June 12 he saw Jesse Jones in Washington; that Jones was then in a meeting discussing the loan with the British; that the plaintiff then gave to Jesse Jones the message from Hopkins and that Jones said that "he would bear it in mind."

Then we have a letter dated June 14, 1941 from Harry Hopkins to Jesse Jones (Exhibit 11) as follows:

"The President is anxious to find a way to do something about this matter. I am enclosing confidential correspondence from the White House so you can see what goes on. *Will you return it as soon as you have read it.*

"I am not sure what techniquest there are to use. It occurred to me that some of it might be done in the shipment of food direct under the Lend-Lease Bill, although just how we could call that outfit a 'democracy' I don't know. Perhaps instead of using his royalties on oil as collateral we could use his royalties on the tips he will get in the future on the pilgrims to Mecca."

While it is a bit out of order I think I should now refer to a letter (Exhibit 12) from Jones to Hopkins, written a day after the loan was closed (July 22, 1941), the pertinent part of which reads as follows:

"You wrote me on June 14th, hoping I could find some way to assist King Ibn Saud.

"There appears no legal way that we can help the King so, with the approval of the President, I suggested to Lord Halifax and Sir Frederick Phillips, also Mr. Neville Butler, that they arrange to continue taking care of the King."

Then there was the note of the President to Jesse Jones (Exhibit 29) which reads as follows:                7/18/41
"Jess—

"Will you tell the British I hope they can take care of the King of Saudi Arabia. This is a little far afield for us.

                F. D. R."

In addition there was read into evidence part of a statement made by Jesse Jones as follows:

"While negotiating a collateral loan I showed the President's note to the British representatives and suggested that they consider providing the King with such funds as they in their opinion felt might be necessary."

This last statement by Jesse Jones is borne out by a letter he wrote to the Secretary of State (Exhibit 28) under date of August 6, 1941 in which he stated, among other things:

"The President wrote me the following note (set forth above) which I showed to Sir Frederick Phillips, *with the request* that the British Government furnish the King of Arabia with whatever funds it felt were desirable and necessary; that the United States Government was not in a position to make any advances whatever to the King of Arabia, or to any oil in the ground in Arabia."

Plaintiff further testified that after June he was trying to get a letter from Jesse Jones as to the collateral loan and concerning the stipulation of the British to take care of the financial needs of the King of Arabia and finally he did receive the following letter dated August 11, 1941, (Exhibit 17):

"Further and due consideration has been given to the matter of aid to the King of Saudi Arabia.

"It is clearly the responsibility of the British to furnish the King with such aid

as in their opinion he is entitled to and they feel would be helpful to their cause.

"We would like to help the California Arabian Standard Oil Company, but there is no way that we can do it unless they wish to borrow money on a properly secured note."

Plaintiff testified that he was dissatisfied with this letter and that in early September he went to Washington to see the President and Mr. Jones; that he did not see the President but did see Mr. Jones; that he talked to Mr. Jones and asked him "If he would give me another letter"; "that I understood it was more or less a stipulation on the part of the President that the British were to do this and he (Jones) told me that the collateral loan had been concluded and that he had spoken to the British about it, and it was understood that they were to take care of the King but he said he did not want to give me a letter without further talking to the President."

. Plaintiff further testified that he finally spoke to the President about getting a further letter from Jesse Jones and that he did receive such a letter dated October 9, 1941 (Exhibit 22):

"With further reference to your request that aid be provided by our Government for King Ibn Saud, through an advance of several million dollars, beg to advise I am informed that funds cannot be advanced to the King under the Lend-Lease Act, and no Government agency has the authority to provide the King with funds.

"I discussed the matter with the President and the Secretary of State. They were both sympathetic with the King's needs and regretting that our Government was not in a position to make him a loan, or an advance on oil royalties that may accrue to him through leases held by your company at some future date.

"At the instance of the President and the Secretary I suggested to the British Ambassador that Britain consider providing King Ibn Saud with such funds as in its opinion were necessary to meet his requirements.

"The Oil Companies interested might, if they wanted to do so, work out some arrangement between the British Government and the King."

I have gone into the factual situation of the plaintiff's case with some detail. After all it is an important case; a great deal of money is involved. I have endeavored to set forth the chain of facts and circumstances upon which plaintiff relies to prove his case and the facts and circumstances occurring after the consummation of the loan which plaintiff contends strengthens his claim.

I have given the plaintiff's proof the fullest credit which it should have on a motion of this type and still I am not convinced that there is sufficient proof on plaintiff's part. Plaintiff's proof falls short of proving his claim. I feel that there has been a failure of proof on his part.

Frankly, I was seriously considering at the end of plaintiff's case and also at the end of the entire case whether or not I should grant defendant's motion to dismiss, but I reserved decision because I was mindful of the suggestion to Trial Judges that, generally speaking—although there may be exceptions—it is desirable not to direct a verdict at the close of the evidence, but to reserve decision on any motion therefor and allow the jury to bring in a verdict " * * * after which he may set it aside if he deems it improper." Fratta v. Grace Line, Inc., 2 Cir., 139 F.2d 743.

In all conscience I feel I should set this verdict aside and direct a verdict for the defendant.

It seems to me that plaintiff's evidence proved nothing more than that the President and also the Secretary of State were aware of the needs of the King of Saudi Arabia and were sympathetic; that the various methods to aid the King suggested by the defendant and also by the President were not possible, such as help through Lend-Lease or a direct loan, an advance on oil royalties, a sale of oil to the Navy and a purchase of oil in the ground from the King.

These methods of helping the King being unavailable, all we have left is a *hope* by the President that the British "can take care of the King"; a *suggestion* by

Jesse Jones to the British ·representative "that Britain *consider* providing King Ibn Saud with such funds as in its opinion were necessary to meet his requirements"; or the showing of the President's note by Jesse Jones to the British representatives, prior to closing the loan, with the *request* that the British Government furnish the King· of Arabia with whatever funds it felt were desirable and necessary.

Whether it be a hope, a request or a suggestion, it in no way approximates the claim of the plaintiff as set forth in his complaint and as urged on the trial.

There is no proof in the record that plaintiff's services resulted in the Government of the United States requiring the British, as part of the 1941 collateral loan, to assume the budget requirement of the King of Arabia.

There is proof in the record that in 1941, 1942 and 1943 the British Government did advance to the Arabian Government approximately $34,000,000. There is no proof in the record that as the result of plaintiff's services "in Washington the British were required to take out of that $450,000,-000. loan whatever Ibn Saud needed and pay it over."

[3] There is no proof on the part of the plaintiff to meet the burden which I feel he had to sustain his case, i. e. that he was the procuring cause, the efficient cause, or the proximate cause of the result claimed by him, namely, that as a result of his efforts the Government of the United States in allowing the loan of July, 1941, required as a condition of the loan that the Government of Great Britain assume the budget requirements of the King of Saudi Arabia for the duration of the War.

There is no proof that the British Government in making the advances to the King of Saudi Arabia in 1941 and for several years following were motivated or influenced in any way by the granting of the collateral loan or by an representation or request made during the negotiations for the loan by anyone representing the United States.

Plaintiff urges that the words "suggested" and "requested" as used by Jesse Jones should not be narrowly construed but that in these negotiations between sovereign States conducted in the language of diplomacy, they should be construed to mean "required"; that all the facts and circumstances of the case lead to logic and reason to the conclusion that the United States Government required the British Government to take care of the Arabian Government's financial requirements.

I just cannot see it that way. The facts and circumstances of the case lead me to the opposite conclusion, as I have indicated above.

The plaintiff further argues that the officials of defendant acknowledged the success of plaintiff's efforts and thereby claimed that the defendant was instrumental in obtaining financial relief for Saudi Arabia as the result of Jones' discussion with the British negotiators. I do not agree with this. As a matter of fact the only information they had was the report of plaintiff to them and the letter from Jones to plaintiff. True, the defendant's officials were endeavoring to keep face with the King in order to keep the King friendly. I believe these officials went far afield in what they tried to picture to the King had been accomplished by them for him.

At any rate I do not regard this attitude of defendant's officials as an admission of defendant's claim nor as proof of it.

Defendant also moves to dismiss the complaint and for a directed verdict on the ground that the contract was contrary to public policy. This motion was made both at the end of plaintiff's case and at the end of the entire case.

In passing on this motion I am considering the contract alone; that is the contract that plaintiff claims was entered into. In passing on this question one must go into all the facts and circumstances leading up to the making of the alleged contract and the result which plaintiff claims was sought.

Prior to April, 1941, a grave crisis had occurred between defendant and its associates and the King of Saudi Arabia. The King was demanding $6,000,000 a

year for the duration of the War. Defendants were unwilling to advance this sum and yet they realized that they must do something on their part to aid the King. They had very valuable concessions for the development of petroleum and minerals in Arabia which had been granted to them by the King. They must protect their interests. They could not afford to lose this friendship of the King. According to plaintiff, in their dilemma they came to plaintiff who was an officer of two of the oil companies closely affiliated with defendant. He was indeed an expert and authority in the oil industry and I believe recognized as such in this country and abroad. He had held positions of trust and prominence in the industry and had had a great deal of experience in the development of foreign oil concessions.

On the other hand, plaintiff had long been a friend of the President. One might very well call it an intimate friendship. He had been appointed to a responsible position on one of the committees of the National Recovery Act and had also been appointed Federal Housing Administrator by the President. In his testimony plaintiff told of his close and intimate friendship with the President.

It may very well be that plaintiff was chosen to obtain relief for these oil interests because of his knowledge of foreign affairs, particularly as applied to the oil industry. Yet this assumption is closely tied up with the fact of the close personal friendship between the two men.

I can't help but feel that on plaintiff's story alone he was chosen by his associates as a man, of course expert in the field, but by and large as much if not more for his close relation with the President; one who, if any one could, might obtain relief for the defendant and its associates in their hour of peril from the man who might be able to help them. In this connection I shall call attention to a bit of testimony given by plaintiff on cross-examination:

"A. I believe that they were coming to me because they thought I could get them the help if it was possible.

"Q. Yes? A. And that I knew the President.

"Q. Yes? A. And was friendly with him, that he trusted me, that he had appointed me to represent the Government in an emergency on the oil * * * for the oil industry against the oil industry."

Plaintiff had nothing to sell to the Government and therein may be distinguished the cases cited by plaintiff in his brief. Plaintiff was really dealing in a matter of State, and really contemplated personal solicitation for aid to the defendant and its associates.

■ I am of the opinion that the services contemplated under this contract are the kind that the law says may not be compensated for. They are against public policy.

■ For professional services, of course, a just compensation may be recovered, but when they are blended and confused with those that are forbidden the whole is a unit and they perish together.

■ Services of the latter character gratuitously rendered are not unlawful. The taint lies in the stipulation for pay. See Trist v. Child, 21 Wall. 441, 88 U.S. 441, 22 L.Ed. 623. See also Lyon v. Mitchell, 36 N.Y. 235, 93 Am.Dec. 502.

■ I shall now take up the issues raised by the motion of the defendant to set aside a verdict and for a new trial. Although this motion is made in the alternative, I believe I have to pass on it, notwithstanding that I have decided the first motion in favor of the defendant. Montgomery Ward & Co. v. Duncan, 311 U.S. 243, 61 S.Ct. 189, 85 L.Ed. 147.

On this branch of this motion defendant raises three points as follows:

"Point I The verdict, in so far as it necessarily rests on a finding that Aramco agreed to employ Moffett to obtain United States Government to aid Saudi Arabia, and to pay him for his services, is against the clear weight of the evidence, and must for that reason be set aside.

"Point II The verdict, in so far as it necessarily rests on a finding that Moffett was the producing cause of the British advances to the King, because he prevailed on the United States to require Great Britain to assume the King's budget, is against

**182**

all of the competent and credible evidence, and must for that reason be set aside. .

"Point III The plaintiff's delay in asserting his claim."

For the purpose of deciding the motion I deem it only necessary to consider point II.

It will not be necessary for me to write at great length. I discussed in detail this same factual question when passing on the motion for the direction of a verdict.

In passing on the first motion, I only took into consideration plaintiff's case. Even assuming that there is merit in plaintiff's contention that the chain of circumstances started by him resulted in the United States requiring Great Britain to assume the budget of the King of Arabia, when one views plaintiff's claim in the light of the entire testimony one comes to the inevitable conclusion that the verdict of the jury was against the weight of the evidence and should be set aside.

The testimony of Jesse Jones clearly demonstrates that he did nothing during the negotiations for the loan in 1941, looking at it in the most favorable light to plaintiff from which one might reasonably infer that the British were required to take care of the King as one of the conditions of the loan.

The loan agreement itself is some evidence against plaintiff's claim. The loan was a collateral loan, fully collateralized by the deposit of marketable American securities owned by the British. The purpose of the loan was to provide the British Government with dollars to pay for war materials and supplies bought in this country. The loan agreement (Defendant's Exhibit FF) was barren of any reference to financial aid to the King of Saudi Arabia.

Jesse Jones testified emphatically that he never stated in words nor substance to any representatives of the British Government that there was any condition, or agreement by the British Government, as to the collateral loan other than those specified in the written agreement for said loan. He further denied specifically that any representatives of the British Government ever told him in words or substance that there was any condition, or agreement by the British Government, as to the collateral loan other than those specified in the written agreement for such loan.

Jesse Jones further denied that he ever "stipulated" with the British for aid to the King of Saudi Arabia.

It might be timely at this time to state the fact that there was not a scintilla of proof on the part of the plaintiff as to how the British reacted to the so-called "request" of Mr. Jones for financial aid to Arabia; nor was there any indication that they acted on any such request. There is, however, proof to the contrary introduced into evidence by the defendant (Defendant's Exhibit HH).

For the reasons above stated, after a most careful and painstaking review of the evidence and after long and most serious deliberation, I feel constrained to grant defendant's motions.

Settle order on notice