Paul E. MERRILL, as Executor of the Estate of John B. Merrill, Deceased, and as Administrator of the Estate of Ann T. Merrill, Deceased,

v.

UNITED AIR LINES, INC., Defendant.

United States District Court
S. D. New York.
Feb. 5, 1960.

See also, D.C., 177 F.Supp. 704.

Ed. 222; Bankers' Trust Co. v. Missouri, K. & T. Ry. Co., 8 Cir., 1918, 251 F. 789.

Kreindler & Kreindler, New York City, for plaintiff, Harry E. Kreindler, Lee S. Kreindler, New York City, of counsel.

Haight, Gardner, Poor & Havens, New York City, for defendant, William J. Junkerman, Maurice L. Noyer, New York City, of counsel.

HERLANDS, District Judge.

A jury verdict having been returned for defendant, plaintiff now moves under F.R.Civ.P., rule 59, 28 U.S.C.A. "for a new trial, or, in the alternative, for a rehearing of the plaintiff's motion to set aside the jury's verdict herein, made upon the rendering of said verdict, and for a new trial."

The trial consumed ten court days. The transcript of the trial testimony runs to 954 pages.

The case was ably presented in behalf of both sides by attorneys who are acknowledged experts and specialists in the field of aviation accident litigation.

Plaintiff did not move for a directed verdict at the conclusion of all of the

evidence.[1] The charge to the jury, covering 33 pages of the record, was in all respects satisfactory to plaintiff, who did not take a single exception to it nor submit a single supplemental request to charge.

Thereafter, plaintiff brought on the present motion for a new trial. Voluminous moving and opposing papers have been filed. The court heard extensive oral argument, the minutes of which amount to 86 pages.

■ A motion for a new trial (F.R. Civ.P., rule 59) is to be distinguished from a motion for a directed verdict or a motion to set aside a verdict. The criteria governing the court's discretion in granting or denying a motion for a new trial are different from those applicable to the "verdict" motions. This distinction, as well as the applicable standard, had been expounded in many decisions.[2]

Applied to the facts of this case, the governing criteria compel the denial of plaintiff's motion for a new trial.

Plaintiff asserts three propositions in arguing that the court should grant his motion to prevent a miscarriage of justice: (I) that the verdict is based on false evidence and that defendant practiced a fraud upon the court by means of perjured testimony by one Captain Kehmeier, a key defense witness, whose testimony took plaintiff by surprise at the trial and the falsity of which testimony

1. In Muryn v. New York Central Railroad Company, 2 Cir., 1959, 270 F.2d 645, the court said:

"The plaintiff, having consented to go to the jury on the factual issues, by his failure to move for a directed verdict, will not be heard now to challenge the verdict for the defendant on the ground of the insufficiency of the evidence. Jorgensen v. York Ice & Machinery Corporation, 2 Cir., 1947, 160 F.2d 432."

In Carroll v. Hubay, Jr., 2 Cir., 1959, 272 F.2d 767, 768, the court said:

"The plaintiff did not ask for a directed verdict against Hubay and took no exception to the charge, but expressly accepted it as correct. In such a situation no appeal lies from a judgment upon the verdict. (collecting authorities)."

2. See Montgomery Ward & Co. v. Duncan, 1940, 311 U.S. 243, 251, 254, 61 S.Ct. 189, 85 L.Ed. 147; Hedden v. Iselin, 1892, 142 U.S. 676, 680, 12 S.Ct. 330, 35 L.Ed. 1155; 6 Moore, Federal Practice, para. 59.08; 3 Barron & Holtzoff, Federal Practice and Procedure, § 1302.

Second Circuit: See Binder v. Commercial Trav. Mut. Acc. Ass'n, 1947, 165 F.2d 896; Moffett v. Arabian American Oil Co., D.C.S.D.N.Y.1949, 85 F.Supp. 174, 181, affirmed, 1950, 184 F.2d 859, certiorari denied 340 U.S. 948, 71 S.Ct. 533, 95 L.Ed. 683; Newsum v. Pennsylvania R. Co., D.C.S.D.N.Y.1957, 97 F.Supp. 500; Markusen v. General Aniline & Film Corp., D.C.S.D.N.Y.1954, 16 F.R.D. 455, 459, affirmed 1955, 221 F.2d 479; Benjamin v. Lehigh Valley R. Co., D.C.W.D.N.Y.1950, 10 F.R.D. 154.

Third Circuit: Magee v. General Motors Corp., 1954, 213 F.2d 899; DePascale v. Pennsylvania R. Co., 1950, 180 F.2d 825.

Fourth Circuit: Williams v. Nichols, 1959, 266 F.2d 389, 393; McCracken v. Richmond, F. & P. R. Co., 1957, 240 F.2d 484, 488; Snead v. New York Central R. Co., 1954, 216 F.2d 169; Hawkins v. Sims, 1943, 137 F.2d 66; Aetna Casualty & Surety Co. v. Yeatts, 1941, 122 F.2d 350, 352–353; Roedegir v. Phillips, 1936, 85 F.2d 995; Garrison v. United States, 1932, 62 F.2d 41, 42; Norton v. City Bank & Trust Co., 1923, 294 F. 839, 843 [surprise].

Fifth Circuit: Pennsylvania Thresherman & Farmers Mut. Cas. Ins. Co. v. Crapet, 1952, 199 F.2d 850; Marsh v. Illinois Central R. Co., 1949, 175 F.2d 498, 500.

Sixth Circuit: General American Life Ins. Co. v. Central National Bank, 1943, 136 F.2d 821, 823; Felton v. Spiro, 1897, 78 F. 576, 582.

Seventh Circuit: Daffinrud v. United States, 1944, 145 F.2d 724, 725.

Ninth Circuit: Moist Cold Refrigerator Co. v. Lou Johnson Co., 1957, 249 F.2d 246, 256, certiorari denied 356 U.S. 968, 78 S.Ct. 1008, 2 L.Ed.2d 1074.

Tenth Circuit: Hunter v. Thomas, 1949, 173 F.2d 810, 812 [perjury].

D.C. Circuit: Childs v. Radzevich, 1943, 78 U.S.App.D.C. 235, 139 F.2d 374, 376; Miller v. Pennsylvania R. Co., D.C. D.C.1958, 161 F.Supp. 633.

could be established by plaintiff only after the trial; (II) that the court misapplied the principles applicable to plaintiff's motion to set aside the verdict and that the verdict is against the clear weight of the evidence; and (III) that plaintiff was substantially prejudiced by defense counsel's remarks in his opening to the jury with respect to plaintiff and also by the trial testimony of a witness named Covert.

Each of these propositions is untenable, as will be shown.

■ The action arose out of a fatal airplane crash occurring on October 6, 1955, when defendant's DC–4 airplane struck Medicine Bow Peak in Wyoming. All of the passengers and the crew were killed. Among the passengers were John and Ann Merrill. They left surviving them two infant children. This action was brought by Paul Merrill, the brother of John Merrill, as executor of the estate of John Merrill and as administrator of the estate of Ann Merrill. The applicable wrongful death statute is that of Wyoming.

In behalf of plaintiff, various contentions were advanced at the trial. These were skilfully and clearly presented by plaintiff's counsel to the jury.

Upon the trial plaintiff contended:

(1) That the flight en route from Denver to Salt Lake City was governed by visual flight rules (VFR), as distinguished from instrument flight rules. This was not disputed by defendant.

(2) That the filed flight plan called for the airplane's following a course designated by specific airways. This was not disputed by defendant.

(3) That when the plane took off from Denver, it was about one hour and fifteen minutes behind schedule. This was not disputed by defendant.

(4) That applicable Civil Air Regulations and defendant's flight rules prohibited certain flying operations under certain conditions. This was not disputed by defendant.

(5) That any violation of these regulations and rules constituted some evidence of negligence, although they did not compel a finding of negligence. This rule of law was not disputed by defendant. The jury was so charged.

(6) That the plane did not follow its filed flight plan. Instead, it proceeded in a westerly direction shortly after it reached Ft. Collins. If it had followed the flight plan it would have made the turn for the western leg of its flight farther north. The site of the crash was almost due west of the point where the plane deviated from its flight plan. The crash took place about 23 miles west of the planned course. The point of impact was 11,570 feet above sea level, about 60 feet below the top of the mountain at that point. These physical facts were not disputed by defendant.

(7) That the crew was motivated by a desire to make up some or all of the time that the plane was behind schedule (disputed by defendant). The crew deliberately went off its course in order to take a short cut from Ft. Collins to the North Platte River Valley past Saratoga, and up through Victor 4 airway in the vicinity of Rawlins (disputed by defendant). In so doing, the crew intended to fly through a certain mountain pass (disputed by defendant). In following this short cut, the plane deliberately or negligently changed its course without prior clearance (intent or negligence disputed by defendant); went into an area where there were dangerous mountain waves (the parties disagreed as to whether there was an updraft or a downdraft at the crash site); thereby the plane was caught in a downdraft (disputed by defendant), which caused the plane to miss the mountain pass and to crash into Medicine Bow Peak.

(8) That the doctrine of *res ipsa loquitur* was applicable to this case, notwithstanding plaintiff's partial reliance upon evidence of specific negligence. The court overruled defendant's contention that this was not a *res ipsa* case

in view of plaintiff's proof of specific negligence. Plaintiff received the benefit of a liberal charge on *res ipsa loquitur*. See Kreindler, Using Res Ipsa Loquitur In Airplane Crash Cases, Case and Comment, Nov.–Dec. 1959, p. 3.

(9) That defendant was required by law to exercise the highest degree of care. Overruling defendant, the court so charged the jury. Minutes of October 19, 1959, p. 12.

Prior to trial, the attorneys stipulated (the stipulation being incorporated in a pre-trial order) that witnesses, if called by defendant, would testify that when the plane took off from Denver on this flight, the plane's parts and operating mechanism were completely free from defects. Upon the trial, plaintiff did not call witnesses to prove that the plane was not airworthy when it took off from Denver.

Upon the trial defendant contended:

(1) that the airworthiness of the plane was not disputed.

(2) That it was uncontroverted that the crew operating defendant's plane had had long and extensive training and experience; that the pilot and co-pilot were fully competent to operate the plane; that they were persons of high intelligence, excellent educational background, and unblemished records. (Upon the pending motion, plaintiff's counsel's affidavit states: "We concede * * * that the jury could have found from the evidence that this was a capable and experienced crew * * *.)

(3) That considerations of self-preservation on the part of the crew would have dictated that they take a readily available safe route instead of taking an obviously dangerous, improper route.

(4) That the danger—to be encountered by deviating from the proper course and going towards Snowy Range Mountain where Medicine Bow Peak was located and where significant cap clouds were then visible—was so obvious and stark that it was reasonable to infer that the experienced and intelligent pilot

and co-pilot would not have adopted that course if they had been in full possession of their senses.

(5) That there was no discernible motive or reason for the crew to violate the applicable regulations of the Civil Aeronautics Board and the company's own flight rules; and that this was another circumstance persuasively suggesting that something had happened to the pilot and co-pilot. (Upon the pending motion, plaintiff's counsel's affidavit states:

" * * * the most that can be inferred is that the crew was incapacitated or asleep.

"It is theoretically possible that such incapacitation could have been caused in the exercise of due care by the defendant and all of its employees, including not only the pilots, but maintenance men and inspectors. It is theoretically possible that a depraved passenger could have shot the members of the crew at a time when the autopilot was on and the plane headed for Medicine Bow Peak. It is theoretically possible that noxious gases suddenly and without warning escaped from the cockpit heater, causing incapacitation.")

(6) That something must have happened to the pilot and co-pilot was also indicated by the circumstance that there was excellent flying weather along the official route plan, and that there was no discernible reason for not following that plan.

(7) That it was obvious that the licenses of the pilot and co-pilot would have been revoked immediately for any one of the violations that they had committed; that the experienced and intelligent pilot and co-pilot would not consciously jeopardize their licenses and their flying careers.

(8) That, in accordance with the usual and accepted flying procedures, the autopilot was engaged at a point in the vicinity of Ft. Collins, which point was opposite the crash site, that is, they were

in the same latitude; that the autopilot maintained the cruising altitude of the plane at a set height above sea level (in this case, 10,000 feet); that at about the time when the altitude was set at 10,000 feet by engaging the autopilot and at about the same time when the plane had made a westerly or left turn in order to get to the center of the airway, the pilot and co-pilot became incapacitated; that, as a result—instead of the plane's coming back on the airway after it had made the westerly turn—the plane continued westerly for 23 miles (a very short distance considering airplane speed); that, the cruising altitude having been preset at 10,000 feet, the plane could not get over the higher Snowy Range Mountain which lay in its path; and that the reason why the plane had reached the altitude of 11,570 feet at the time of impact was that an updraft caused by a mountain wave pushed the plane up 1,570 feet in spite of the action of the autopilot (Hoffman's testimony and blackboard diagram were impressive).

(9) That the uncontradicted evidence shows that at the time of the crash, the plane's engines were developing normal cruising power; and that this circumstance tends to establish that there was nothing mechanically wrong with the plane.

(10) That the straps of a smoke mask found after the accident near the site of the crash were pulled tight; and that such condition indicated that the mask had been in use by a member of the plane's crew at the time of impact.

(11) That plaintiff's theory—that the pilots were deliberately attempting to take a shortcut under the circumstances existing on the morning of the accident— defies common sense because [a] it assumes that the pilots were engaged in doing something they had never done before in their careers as pilots, viz., violating every safety rule or regulation of the Government and of their own company; [b] the alleged shortcut was not in fact a shortcut, since the planned airways route was at least two minutes shorter than the dangerous mountain shortcut route; [c] it assumes that the pilots chose to ignore the excellent flying weather along the planned airways route in order to fly through the cloudy and hazardous weather over the Snowy Mountain Range; [d] it assumes that the pilots deliberately flew into the extreme danger of the mountain wave, plunging over the eastern or lee side of Medicine Bow Peak, whose existence had been signalled to them by the cap cloud hanging over the Peak, in spite of the fact that they and all defendant's pilots had been warned of the great danger of flying into such conditions; and [e] it assumes that the pilots did all of the foregoing acts in spite of their knowledge that such a deviation from a planned airways route would be punished by the revocation of their licenses and the end of their careers as pilots as soon as they landed at the next scheduled stop. (Upon the pending motion, plaintiff's counsel's affidavit states: "We concede * * * that the jury could have found from the evidence * * * that it [the crew] would not have intentionally taken a short cut over dangerous mountain terrain in threatening weather.")

The defendant's theory with respect to the incapacitation of the crew was covered in the court's charge to the jury. Minutes of October 19, 1959, p. 9.

## I.

In support of his present argument that the verdict is based on false evidence, plaintiff's counsel submits the following: (1) Affidavit of plaintiff's attorney (Lee S. Kreindler) sworn to October 29, 1959; (2) Letter of G. C. Kehmeier, dated October 13, 1955; (3) Affidavit of Frederick W. Welch, sworn to October 23, 1959; (4) Affidavit of Allen Auten, sworn to October 25, 1959; and (5) The allegedly "false and fraudulent" trial testimony of Kehmeier concerning the smoke mask. See Exhibit "4" annexed to the Kreindler affidavit.

Upon the trial, Kehmeier testified that he arrived at Medicine Bow Peak, the scene of the accident, five days after it happened; that he found the mask "on a rather precipitous ledge which would not have been possible for an average person to get anywheres near." Kehmeier was an expert mountain climber. Kehmeier also testified that this was a somewhat inaccessible ledge; that in his opinion nobody had been there before him; that there was not enough room for the bodies of the pilot and co-pilot to be on the ledge; that he could tell that nobody had been on the ledge before him because there was fresh snow and no tracks; that the pilots' seat belts were found perhaps seventy or eighty yards away, on another ledge further up on the mountain. The smoke mask was found in the general area of the other airplane wreckage. The mask was located about a hundred yards below the point of impact of the plane and the mountain. He examined the mask when he found it "lying face down, straps were in a position as they are, indicating the mask had been in use at the time of the impact." The straps were pulled up, indicating that the mask had been worn. There was nothing inside the mask when he found it. Later he gave the mask to representatives of the C.A.B. (MacNamara or Van Epps) who had not been at the scene where he found the mask.

Plaintiff's attorney's main moving affidavit (p. 5) admits that, in any inquiry into the cause of the accident, "the most important question" would be "whether the pilots of the airplane were in possession of their faculties" and that "the finding of a smoke mask with straps pulled-up tight in a manner indicating it had been worn would be of crucial importance."

Plaintiff's attorney asserts that "the utter falsity" of Kehmeier's testimony is demonstrated by three documents: Kehmeier's letter to the C.A.B. dated October 13, 1955; and the Welch and Auten affidavits.

Plaintiff claims that the fact that Kehmeier's letter of October 13, 1955 to C.A.B. "does not even make a mention of the smoke mask or its straps" is in itself "probative of the falsity of his testimony," because if a mask had been found it would have been crucially important on "the most important question" whether the pilots had become incapacitated.

Kehmeier's letter is attached to plaintiff's main moving affidavit as Exhibit "1." The impression created by the main moving affidavit (p. 4) is that plaintiff's counsel "obtained" the photostatic copy, which is Exhibit "1," "as a result of an investigation" which he conducted "following the startling jury verdict." In point of fact, this letter is part of the C.A.B. file. Plaintiff's counsel admittedly was familiar with the file before the trial commenced. Upon the oral argument of this motion, when queried by the court, plaintiff's counsel stated that, although he had been familiar with the C.A.B. file before the trial commenced, he had not obtained the exhibits, including this particular letter.

The error inherent in the contention of plaintiff's counsel with respect to the letter is that it misinterprets the purpose of the letter. The letter was written for the specific purpose of advising the C.A.B. that it would be dangerous to continue working on the peak for reasons expressed in the letter; Kehmeier concluded that he "would not recommend additional exposure."

The letter does refer to the circumstance that there were five men who ascended Medicine Bow Peak on October 11 and October 12, 1955: Kehmeier, Romeo, Legere, Auten and Welch, whose names are listed in the letter. The letter points out that three of the five men were professional airline pilots: Kehmeier, Romeo and Legere. The letter also refers to the fact that two of the men were professional mountain climbers: Romeo and Legere. Kehmeier himself was an experienced mountaineer. The other two men, Auten and Welch, were neither em-

ployees of United Airlines nor professional mountain climbers. The letter further states:

"Certain parts and information was recovered and delivered to the camp at the bottom of the hill."

Representatives of the C.A.B. were in this camp. There is no doubt about the fact that Kehmeier delivered a smoke mask to two representatives of the C.A.B. who were stopping at the hotel out of which the C.A.B. representatives worked. Indeed, Auten and Welch, whose affidavits are submitted by plaintiff, refer to the fact that a smoke mask was found. There is no room for debate as to whether or not a smoke mask was found.

In his affidavit, plaintiff's counsel discusses Auten's and Welch's affidavits. Incidentally, Auten and Welch, as well as Romeo and Legere, were presumably available at all times prior to the trial, a circumstance that may be inferred from the relative ease with which the parties have been able to obtain their affidavits for use on the present motion. In any event, after analyzing Auten's and Welch's affidavits, plaintiff's counsel argues that there is only "one inescapable conclusion," namely, that Kehmeier "consciously and affirmatively lied when he testified that he found the mask on an isolated, inaccessible ledge, where no one had been before him, which ledge was too small even to hold the bodies of the pilot and co-pilot," and that Kehmeier perjuriously testified that the straps of the mask were pulled tight.

It becomes necessary to examine the Auten and Welch affidavits. Welch's affidavit, sworn to October 23, 1959 (four years after the accident) states in part that one smoke mask was discovered when the group of five men arrived at the scene on October 11, 1955; that "the body removal group" had preceded the group of five men and had removed all bodies prior to the arrival of the group on October 11; that "one of my group" discovered the smoke mask.

Welch does not identify the discoverer as Kehmeier.

He says "I think" that the smoke mask was found "in the vicinity of the fuselage." This indicates that he does not know where the mask was found.

Welch describes the smoke mask and says that "he formed the opinion that it had not been worn." This opinion was based upon the circumstance that the mask appeared to be "clean" and it did not contain any indications in the way of portions of the human anatomy or blood. "Thinking back" to October 1955, he now states that he feels confident "that the straps attached to the mask were hanging loose in an unfastened condition."

Welch's opinion is based mainly upon "lack of viscera, blood, or other portions of human anatomy" on the mask. However, these are not the only telltale signs. A most important criterion is whether the straps were tight or loose. Welch's ability to judge whether the straps were tight or loose is evidenced by his statement that "I feel confident that the straps attached to the mask were hanging loose in an unfastened condition."

Actually (as First Officer Dale W. Rogers demonstrated on the witness stand), the ends of the straps always hang loose, whether the straps are drawn tight or loose. This is corroborated in the affidavits of Kehmeier, Legere and Romeo. It is the relative position of the straps with respect to the buckle attached to the mask that determines whether they are drawn tight or loose. That is a circumstance which would be meaningful to pilots but which an inexperienced layman, such as Welch, would not be qualified to evaluate.

Auten's affidavit states that "we" found a mask "such as is used for emergency oxygen." He does not mention that Kehmeier found the mask. He says that the mask was found in an area measuring 30 by 40 feet, which was littered with debris from the forward portion of the aircraft; that this area was rea-

sonably accessible and had been worked over by the body removal group prior to the arrival of the group of five men.

He states that he did not remember whether he himself found the mask or which member of the group actually found the mask. He then significantly admits: "I have no recollection concerning the condition of the straps, specifically." He did recall that the mask was found on top of an 18-inch pile of debris.

In the concluding portion of his affidavit, he makes the critical admission: "As far as I was concerned, from looking at the mask, I could not tell whether or not it had been worn, * * *."

Auten neither knows who found the mask nor its condition when found. His disagreement with Kehmeier as to relatively minor details, e. g., a description of the site where the mask was found, has no substantial impact on the case.

Neither Welch nor Auten was an airplane employee. Neither had any particular knowledge of airplane parts or smoke masks. There is no indication that, on the basis of knowledge or experience, they were qualified to express an opinion as to the significance of the condition of the mask and its straps with respect to the vital question whether or not the smoke mask had been worn.

The probative value of the Auten and Welch affidavits is substantially attenuated not only by the circumstances already adverted to but also by the affidavits of Kehmeier, Romeo and Legere, submitted by defendant in opposition to the present motion.

The opposing affidavit of defendant's trial counsel attaches (as Exhibit "A") the transcript of Kehmeier's testimony before the C.A.B. on November 15, 1955. This is the testimony that plaintiff's attorney admits he had read prior to the commencement of the trial herein. It is highly significant that, in the course of Kehmeier's testimony, Kehmeier referred by name to Romeo and Legere, their participation in the search to recover component parts of the aircraft and Kehmeier's memorandum (the letter of October 13, 1955) to the Bureau of Safety Investigation. It is this memorandum or letter which was read into the record of Kehmeier's testimony and then marked in evidence as Exhibit "8–A." In other words, if plaintiff's counsel read the testimony before the C.A.B., as he says he did, he was charged with the knowledge of Kehmeier's memorandum, which was set forth *in haec verba* in the transcript of the testimony.

Upon the oral argument of the pending motion, plaintiff's counsel admitted that, in reading the transcript of the C.A.B. hearing in 1955 or early 1956, he read Kehmeier's testimony (Minutes of argument, p. 54). He now asserts that "it made no impression upon me whatsoever" (Minutes of argument, p. 12). Plaintiff's counsel also admitted; "Incorporated in the CAB transcript is the text of Kehmeier's letter. It does not appear as a letter, though" (Minutes of argument, p. 13). In front of the particular transcript of the C.A.B. hearing, there is an index of exhibits; and Exhibit "8–A" is "Statement of G. C. Kehmeier" (Minutes of argument, p. 55).

In view of plaintiff's attack on Kehmeier's testimony—that he found a smoke mask with the straps pulled tight, indicating that the mask had been in use at the time of impact—it becomes necessary to examine not only Kehmeier's trial testimony but also the affidavits of Kehmeier, Romeo and Legere, submitted by defendant in opposition to the present motion.

Kehmeier testified that he went to the scene of the investigation on October 10 and 11, 1955. He had been requested to help because he was an experienced mountain climber. Kehmeier's job was to concentrate on the following questions: (1) Whether the power plants were developing power at the time of impact; (2) Whether the pilots were in their seats at the time of impact; and (3) Information that could be derived

from the instruments or parts that he could look at or photograph.

He ascertained that the engines were all developing normal cruising power at the time of the impact and that the plane was in a nose high attitude at that time. He then testified that, at the scene of the accident, he discovered a smoke mask similar to defendant's Exhibit "N" in evidence. He found it on the afternoon of October 11th on a rather precipitous ledge which the average person could not possibly have gotten near. He found the smoke mask lying face down in the general area of the wreckage. The fact that its straps were pulled up tight indicated that the mask had been in use. He could tell that nobody had been on the ledge before him because there was fresh snow and no tracks.

Kehmeier then explained that all of defendant's DC-4's had automatic pilots and that, when an autopilot is set on a particular magnetic course, the plane will continue to fly on that course even though neither the pilot nor the co-pilot touches the controls. He then testified as follows (s. m. p. 562):

"Q. How do you account for flight 409 being 23 miles off its course?

"Mr. Kreindler: I object to that question. I will withdraw my objection.

"Q. Go right ahead, sir. A. The crew was incapacitated.

"Q. In your opinion is that the cause of that accident? A. Yes.

"Mr. Junkerman: No further questions.

"Recross Examination by Mr. Kreindler:

"Q. I take it part of your opinion is that one of the pilots had put the smoke mask on? A. That is part of it."

Kehmeier's affidavit submitted upon the present motion clarifies the seemingly contradictory statements of Welch and Auten. Kehmeier specifically refers to

(1) the condition of the straps when the mask was found ("the straps pulled at the back as though it had been in use"); (2) the fact that he "called to Romeo and Legere so that they could look at it before it was disturbed"; (3) the fact that he did not touch the mask until after Romeo and Legere looked at it, nor did he or any one else change the position of the straps; (4) the fact that the mask was delivered on the evening of October 11, 1955 to the C.A.B. representatives in the Connor Hotel in Laramie, Wyoming.

Both Legere and Romeo completely corroborate Kehmeier. In their affidavits they state:

"He [Kehmeier] pointed to the mask lying face down on the sloping contour of the cliff and all three of us then examined it at the same time. I personally noted that the adjustment straps of the mask were in a tightened position, indicating that it had been used. I recall that later that day, in the Hotel Connor at Laramie, the mask was produced from Captain Kehmeier's backpack and turned over to the Civil Aeronautics Board representatives at a time when I was present. At the time it was turned over to the CAB representatives it appeared to be in the same condition as when I saw it on the cliff where it was found."

Kehmeier made a most impressive witness. The substance of his testimony remains unimpaired. The current affidavits of Romeo and Legere strongly corroborate Kehmeier.

Upon the trial, Kehmeier testified that MacNamara [William MacNamara, then chairman of the Operations Committee of the C.A.B. inquiry] and Van Epps [George Van Epps, then chairman of the Structures Committee of said inquiry] were the men to whom he gave the mask (s. m. p. 528). Plaintiff's counsel's present speculations about the hypothetical testimony of these men and several other C.A.B. representatives do not

constitute evidence. Plaintiff's counsel had taken Van Epps' deposition on April 3, 1958 in this action; and he examined him about broken oxygen bottles and the smoke mask. He even telephoned Van Epps during the trial. It is too late in the day to consider fine-spun arguments based on surmise.

Plaintiff's counsel had access to Welch and Auten as possible witnesses at all times since the C.A.B. hearing in November 1955. Apparently no attempt was made to interview them until after this trial was completed. Their affidavits for use on this motion have been obtained promptly.

■ We come then to the question of "surprise." At the trial, plaintiff's counsel did not plead surprise with regard to Kehmeier's testimony or the subject of the smoke mask. Had he done so and had he been able to justify claimed surprise, plaintiff's counsel would have been given an opportunity to produce Welch, Auten or other witnesses in rebuttal.

At no time up to and including the summations and until the present motion, did plaintiff's counsel intimate that he was surprised by Kehmeier's testimony or by defendant's contention that the crew must have been incapacitated as the result of a pure accident.

In the light of the facts as they have now been developed, it is extremely doubtful whether a claim of surprise could have been substantiated because: (1) admittedly, plaintiff's counsel had—as far back as January 4, 1957—possession of a transcript of Kehmeier's trial testimony in the case tried in Salt Lake City in October 1956, where Kehmeier gave substantially the same testimony about the smoke mask as he gave in the present trial; (2) plaintiff's counsel is charged with knowledge of Kehmeier's letter set forth in the C.A.B. hearing transcript of November 1955, as he had that transcript before trial; (3) plaintiff's counsel was alerted by defendant's counsel's opening in which a reference was made to the possibility that the crew

may have become incapacitated; (4) plaintiff's counsel manifested awareness of the smoke mask as an element in this case when he examined Van Epps in the course of the April 3, 1958 pre-trial deposition; and (5) in an affidavit, sworn to August 9, 1956, by one of the defense counsel's partners in relation to a motion to transfer this action, defense counsel listed the defense witnesses and the fifteenth witness so listed was Kehmeier who, it was said therein, "will testify concerning the on-the-scene investigation."

The decision by plaintiff's counsel—not to plead surprise or ask for an adjournment but rather to proceed with an attack on the defense theory of crew-incapacitation—appears to have been a planned and deliberate tactic agreed upon by the two attorneys acting as plaintiff's counsel.

Although plaintiff's counsel now asserts he "was completely caught by surprise" by the evidence concerning the smoke mask, he offers a lame excuse for not having made a plea of surprise and a "motion for a mistrial or adjournment." He says that the "expenditure of time, effort, and money on the part of the plaintiff" involved in such plea or motion made such plea or motion "unlikely." This is unclear.

In the next breath, he admits having given "careful consideration" to "the possibility of pleading surprise and seeking an adjournment or a mistrial." He declares that he "felt that such a delay would be extremely prejudicial to the plaintiff." Finally, plaintiff's counsel and co-counsel concluded "that the best course to follow would be that we not plead surprise and that we not ask an adjournment or a mistrial, but that we attempt to develop as many facts as we possibly could through cross-examination of Kehmeier."

Plaintiff's counsel assumed the calculated risk and strategic choice of having the jury decide the issue of "crew incapacitation" by vigorously cross-exam-

ining Kehmeier and directly attacking the probative merits of defendant's proof. Now that their strategy did not achieve the hoped-for result with the jury, plaintiff's counsel turn around, belatedly plead surprise and engage in an unjustified attack upon defense counsel.

■ Plaintiff's counsel now asserts that he "was misled by the defendant into believing that the defendant would not present" upon the trial herein evidence concerning the smoke mask such as had been submitted through Kehmeier in the trial of another action (arising out of this crash) in Salt Lake City in October 1956. This claim is without merit.

The pre-trial discovery procedures ultilized by plaintiff's counsel herein (specifically, interrogatories numbered 14, 20 and 21 of the interrogatories served January 4, 1957 on defendant) were designed—as plaintiff now concedes—to determine whether defendant was "aware of any facts or evidence indicating a mechanical malfunction or failure that caused or contributed to the accident." Defendant's answers to said interrogatories on May 14, 1957, did not mislead plaintiff's counsel and are completely consistent with defendant's position at the trial herein. The incapacity of the crew does not necessarily indicate that that condition was caused by the malfunctioning of the airplane, its engines or component parts. If plaintiff's counsel interpreted (as he now asserts he did) the said answers to mean "that the defendant has rejected the evidence of the smoke mask that it [defendant] had offered in Salt Lake City," the risk of the correctness of that interpretation rested on plaintiff's counsel.

The basic but erroneous assumption of plaintiff's counsel is (to quote his affidavit) that "[u]se of a smoke mask by a member of the crew could result only from a malfunction of some part of the airplane, causing gas or smoke to be present in the cockpit."

This is not a question of the good faith of defense counsel or of any representations by defense counsel. The defendant's attorneys who appeared in this trial had not represented defendant in any of the three prior actions arising out of this crash, tried in Salt Lake City and Cheyenne. Mr. Junkerman has explained when and how he and Mr. Noyer worked out the defense theory in the instant trial.

That plaintiff's present argument of surprise and deception is an afterthought is further indicated by the circumstance that, in the argument of plaintiff's counsel to set aside the verdict, he attacked defendant's theory of crew-incapacitation but did not utter a syllable concerning his having been surprised or his having been misled by defense counsel (Minutes of October 19, 1959, pp. 55–56).

At the conclusion of all of the proceedings, senior counsel for plaintiff expressed appreciation on behalf of plaintiff's counsel "for the wonderful manner in which you [the court] have conducted yourself throughout this trial; the meticulous manner in which you endeavored to protect the interests of both litigants" (Minutes of October 19, 1959, p. 65).

Recognizing that considerations of fair trial and substantial justice transcend a possible question of counsel's diligence, the court concludes that the totality of the circumstances herein establishes that plaintiff has had a fair and just trial and that counsel on both sides comported themselves in accordance with all professional standards.

A motion for a new trial cannot be used to cushion a litigant's defeat after his experienced lawyer assumed the calculated risk of a particular tactic but received an unfavorable verdict. That unsuccessful counsel would like the opportunity to employ different strategy on a re-trial is not a recognized ground for a new trial.

## II.

■ In arguing that the verdict should be set aside, plaintiff's counsel

took the position "that reasonable minds cannot differ on the basis of this record; that reasonable minds can come to only one result, and that result is the finding of liability" (Minutes of October 19, 1959, p. 57). Because plaintiff's position was so phrased, the court's opinion delivered from the bench at the close of the argument analyzed the record and showed that the verdict for defendant was a reasonable one.

The court's opinion was and is that there has been no miscarriage of justice and that the jury's verdict was not against the clear weight of the credible evidence. In so ruling, the court has exercised its own judgment as to the weight of the evidence considered in its totality. Not only was the verdict for defendant supported by substantial evidence, but it was not contrary to the clear weight of the evidence evaluated qualitatively and quantitatively.

### III.

■ There is no basis to plaintiff's third point that "[t]he verdict reflects the improper and prejudicial conduct of the defendant in intentionally bringing to the attention of the jury prejudicial matter, through the testimony of Covert, and in defendant's opening."

First Officer Covert's testimony appears at pages 454 to 462 of the trial minutes. Plaintiff now argues that "Covert was called solely for prejudicial purposes," that is, he "was called for the sole purpose of testifying on extraneous and prejudicial matters."

Covert had flown as a first officer with Captain Cooke over a period of two years and was a close friend of First Officer Salisbury. Plaintiff's objections to a number of questions put to Covert were sustained. As a result, Covert's testimony dealt principally with the fact that, in 1954 and 1955, he flew eight round trips with Captain Cooke between San Francisco and Denver. When he was asked whether and how he knew First Officer Salisbury, he stated that both of them had been hired by United Air Lines

on the same day; that, when they were in school, they had roomed together; and that, when they were assigned to San Francisco, they were very close friends. When he started to describe their family relationships, plaintiff objected and moved to strike out that part of his testimony. The court sustained plaintiff.

Apparently, the purpose of defendant's calling Covert was to have him testify as to matters concerning which he had previously given testimony, without objection, in the Salt Lake City trial in October 1958.

After the court's ruling, defendant made no attempt to elicit further testimony from Covert. Defendant did not even refer to his testimony in summation. Plaintiff did not submit a supplemental request to charge with respect to Covert's testimony. Clearly, plaintiff was not prejudiced by Covert's testimony.

■ Plaintiff's counsel also contends that certain references to plaintiff's wealth in defendant's opening (p. 24) prejudiced the jury's judgment. The groundless character of this contention is exposed by the following circumstances: (a) Plaintiff's counsel objected to defendant's reference to the plaintiff as an apparently wealthy man. After plaintiff's objection, there was a hearing at the bench in which both plaintiff's counsel and defendant's counsel agreed with the court that the financial condition of the plaintiff had nothing to do with the case and that the court should so instruct the jury (Minutes, pp. 24–26). Thereafter, defendant's counsel never referred to the subject again. (b) Plaintiff's counsel evidently thought that there was no prejudice to his case because it would have been a simple thing at that time— before any testimony had been taken—to have impanelled a new jury. The plain fact is that plaintiff's counsel acquiesced in the court's instruction and made no such request. (c) This matter was adequately covered by the court's charge.

See Minutes of October 19, 1959, pp. 18–19. Plaintiff's counsel did not submit a supplemental request to charge on the subject.

In view of the foregoing, plaintiff's motion is hereby denied in all respects. This opinion constitutes an order.